**U. S. DEPARTMENT OF ENERGY,
Appellant,**

v.

**Milton J. SZULINSKI, Appellee.**

**Appeal No. 81–600.**

United States Court of Customs
and Patent Appeals.

March 4, 1982.

Judson R. Hightower and Richard E. Constant, Washington, D.C., for appellant.

John R. Ewbank and John C. Martin, Philadelphia, Pa., for appellee.

Before MARKEY, Chief Judge, RICH, BALDWIN, MILLER, and NIES, Associate Judges.

BALDWIN, Judge.

This is an appeal from the decision of the United States Patent and Trademark Office Board of Patent Interferences (board) refusing a direction from the Secretary of Energy that the patent on the application of Milton J. Szulinski (Szulinski)[1] issue to the United States Department of Energy (DOE) under § 152 of the Atomic Energy Act of 1954 (Act), 42 U.S.C. § 2182 (hereinafter § 152).[2] We reverse.

*The Invention*

The five allowed claims in the Szulinski application are directed to a system for the

---

**1.** The patent application involved is serial No. 677,339, filed by Szulinski on April 15, 1976, for "Storage Depot for Radioactive Material."

**2.** Section 152, in pertinent part, reads:

*Inventions, conceived during Commission contracts; ownership; waiver; hearings.*

Any invention or discovery, useful in the production or utilization of special nuclear material or atomic energy, made or conceived in the course of or under any contract, subcontract, or arrangement entered into with or for the benefit of the Commission, regardless of whether the contract, subcon-

tract, or arrangement involved the expenditure of funds by the Commission, shall be *vested in, and be the property of, the Commission, except that the Commission may waive its claim to any such invention or discovery under such circumstances as the Commission may deem appropriate, consistent with the policy of this section.*

The Atomic Energy Commission (AEC) was the initial authority referred to in § 152. In 1974, the AEC was abolished and replaced by the United States Energy Research and Development Administration, which became DOE in 1977.

storage of radioactive material comprising a storage depot, "security means" for restricting entry to the depot, and a plurality of surface-accessible, radiation-shielded "vertical storage caissons" dug into the soil of the depot. The claims specify various aspects of the caissons, but the claim language of interest here provides that each caisson have "a depth sufficient to accommodate in a storage cavity at least one but not more than three vertically stacked containers of a type accommodating vertically aligned depleted fuel rods from a light water reactor."

### Issue

The principal question before us is whether the invention claimed by Szulinski was conceived "in the course of or under any contract * * * entered into with or for the benefit of" DOE.

### The Decision of the Board

In concluding that the patent on Szulinski's application should not issue to DOE, the board made the following findings:

(1) Szulinski is limited for the purposes of these proceedings to the conception date of March 5, 1975, set forth in his declaration under § 152.

(2) On March 5, 1975, Szulinski was employed by the Atlantic Richfield Hanford Company (ARHCO) in its Commercial Nuclear Studies division at Richland, Washington.

(3) At that time, ARHCO managed DOE's Chemical Processing Operations in Richland under an "Operating Contract" that provided, inter alia, that ARHCO was responsible for "Waste Management (including crude fission products recovery and long-term storage for all high-level waste)."

(4) In addition, ARHCO was obligated under a separate "Private Contract" with DOE to investigate the potential for "civilian oriented nuclear businesses" in the

Richland area, including the "hot reprocessing of civilian fuels." The Private Contract provided that the results of ARHCO's investigation would "remain the sole property of the Company."

(5) The invention claimed by Szulinski "concerns the underground storage of radioactive material, *specifically, depleted fuel rods from a light water reactor.*" (Emphasis added.)

(6) The "depleted fuel rods" mentioned in Szulinski's claims "were intended to be reprocessed at a future date" and, consequently, did not constitute "waste."

Based on these findings and the precedent of *Fitch v. Atomic Energy Comm'n,* 491 F.2d 1392, 181 U.S.P.Q. 41 (CCPA 1974), the board concluded that the claimed invention was not conceived "under" the Operating Contract because that agreement made "no specific provision for such an invention." Moreover, the board found that the claimed invention was not made "in performing, or as a result of performing, the work required" by the Operating Contract, since the Operating Contract's provision relating to "Waste Management" did not encompass a storage system for radioactive material which was intended for reprocessing and, hence, was not "waste." Accordingly, the board held that the claimed invention was not conceived "in the course of" the Operating Contract, pursuant to the test enunciated in *Fitch.*[3]

### OPINION

We do not agree with the board's narrow reading of the Szulinski claims. The above-quoted claim language pertaining to "depleted fuel rods from a light water reactor" relates only to a definition of caisson depth and, hence, places no restriction on the nature of the "radioactive material" stored in the claimed system. The board in part based its conclusion that the claimed invention is limited to the storage of fuel elements prior to retrieval and reprocessing on

---

**3.** The board also rejected DOE's argument that, even if the claimed invention had been conceived under the Private Contract, DOE was still entitled to the patent. The board stated that the Private Contract "makes no mention of the storage of radioactive material, and in any event the only provision of the contract which refers to nuclear energy * * * specifically provides that the results of each study 'shall remain the sole property of [ARHCO].'"

the requirement in the claims that the closure lid and the radiation shield for each caisson be removable. However, Szulinski's specification indicates that the ability to retrieve stored radioactive material, thereby allowing its removal from one caisson to another, is also related to mitigating "heat dissipation engineering problems," which are not limited to the storage of reprocessable fuel elements. The specification also discloses that a variety of radioactive materials, including "reprocessing wastes," can be stored in the claimed invention "for centuries instead of months." Therefore, we conclude that the claims are not limited to a storage system for depleted fuel elements from a light water reactor, earmarked for reprocessing, as held by the board.[4]

Since the claimed invention comprehends the storage of radioactive material generally, including waste, we find that the claimed invention was conceived in ARHCO's performing, or as a result of its performing, a service associated with waste management (that is, the long-term storage of high-level waste) specified by the Operating Contract.[5] Accordingly, we hold that the board erred in concluding that the claimed invention was not conceived "in the course of" the Operating Contract.[6] *See*

*Fitch v. Atomic Energy Comm'n*, 491 F.2d 1392, 1395, 181 USPQ 41, 44 (CCPA 1974).

Szulinski also argues that the claimed invention was conceived out of his involvement with ARHCO's efforts to develop business opportunities in the nuclear industry's private sector. According to Szulinski, these efforts were strictly separated from ARHCO's endeavors concerning the Operating Contract, which Szulinski urges was limited to the management of "governmental wastes."

However, the record does not substantiate Szulinski's allegation that a clear division existed between his efforts on behalf of ARHCO's private-sector development and those benefiting DOE pursuant to the Operating Contract. There is testimony suggesting that ARHCO's management was alerted to the problem of separating the company's commercial development costs from its disbursements under government contracts. Nevertheless, Szulinski presents no convincing evidence that his work under the Operating Contract was, in fact, substantially disentangled from work performed specifically for ARHCO's project to develop commercial reprocessing of spent fuel elements.[7]

---

4. Szulinski contends that the claims, thus interpreted, are unpatentable over prior art considered below by the primary examiner. However, § 152 mandates that "direction" proceedings be governed by the rules and procedures established for interference cases. Consequently, the patentability of the claimed invention over prior art was not considered by the board, and is not before us. *See, e.g., Kahn v. Phipard*, 55 C.C.P.A. 1284, 1292, 387 F.2d 995, 1001–03, 158 U.S.P.Q. 269, 274 (1968).

5. Szulinski has not seriously argued before us that the claimed invention was, in whole or in part, specifically provided for by the Private Contract. Moreover, there is evidence that Szulinski's activities related to the Operating Contract and the Private Contract, respectively, were largely confluent. *See note 7 infra.*

6. DOE urges that, even if the claimed invention does not concern the storage of radioactive waste, the question of whether the invention was conceived "in the course of" the Operating Contract remains open. However, since we conclude that the claimed invention *does* concern storage of waste, it is unnecessary for us to consider this alternative argument.

7. Indeed, Szulinski's own testimony indicates that the contrary was true:

Q. Were you aware of any restrictions—and this is under the [Operating Contract]—that were imposed on employees who were performing work on the ARHCO Private side, that is, ARHCO Hanford, regarding contract information that was obtained when they were working on or under the [Private] Contract?

A. Now, if I understand the question, again, you are asking me if I was familiar with the contract language, and the answer is I was not familiar with the contract language.

*I knew of no restriction.*

Q. And no one told you that there were such restrictions?

A. Right. It is obvious, again; however, from the standpoint of professional advancement, that *I don't turn myself on and off. My education is continuous.*

(Emphasis added.)

In view of the foregoing, the decision of the board is *reversed.*

REVERSED.